**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

```
GLORIA SULLIVAN,              *
                             *
        Plaintiff,           *    CIVIL ACTION NO. 15-00271-B
                             *
vs.                          *
                             *
CAROLYN W. COLVIN,           *
Commissioner of Social       *
Security,                    *
                             *
        Defendant.           *
```

**ORDER**

Plaintiff Gloria Sullivan (hereinafter "Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On June 13, 2016, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 22). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I.   __Procedural History__

Plaintiff filed her applications for benefits on December 14, 2010. (Tr. 183-85)[1]. Plaintiff alleged that she has been disabled since December 4, 2010, based on arthritis, carpal tunnel syndrome, shoulder problems, high blood pressure, COPD, back problems, muscle spasms, and "nerve problem with index finger on left hand." (Id. at 230, 234).

Plaintiff's applications were denied and, upon timely request, she was granted an administrative hearing before Administrative Law Judge Paul Johnson (hereinafter "ALJ") on May 7, 2012. (Id. at 48-79). Plaintiff attended the hearing with her counsel and provided testimony related to her claims. (Id. at 52). Also appearing and testifying at the hearing was a vocational expert ("VE"). (Id. at 55, 76). On September 12, 2013, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 28). The Appeals Council denied Plaintiff's request for review on March 25, 2015. (Id. at 1). Therefore, the ALJ's decision dated September 12, 2013, became the final decision of the Commissioner.

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). The parties

---

[1] When referencing the Social Security Transcript, the Court uses the page numbers found on the transcript, rather than the page numbers utilized by CM-ECF.

waived oral argument on June 13, 2016 (Doc. 12), and agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   Issues on Appeal

      1.   **Whether the ALJ erred in finding Plaintiff's depression to be non-severe?**

      2.   **Whether the ALJ failed to conduct a full and fair hearing?**

## III. Factual Background

Plaintiff was born on June 21, 1966, and was forty-five years of age at the time of her administrative hearing on May 7, 2012. (Tr. 48, 230). Plaintiff graduated from high school and last worked in 2010 as a switch operator for a train. (Id. at 52-53, 76, 235). Prior to that, she worked as a seamstress, a fish cleaner, and a flag person on a construction crew. (Id. at 53-54).

At her hearing, Plaintiff testified that she cannot work anymore because of her blood pressure[2] (Id. at 57-58). She also has problems lifting and twisting; she has headaches two or three times a week;[3] she has problems sleeping;[4] she has pain in

---

[2] Plaintiff testified that her blood pressure is not under control with medication. (Tr. 65).

[3] At the time of her hearing, Plaintiff testified that she was taking Aleve for her headaches but was not otherwise on any pain medication. (Tr. 66).

her left shoulder, back,[5] neck, and left hand;[6] she has COPD;[7] and she has depression.[8]  (Id. at 59-66).  Her only prescription medication is for high blood pressure.  (Id. at 67).  She has never been to a psychiatrist or psychologist for depression, and she currently takes no medication and receives no treatment for depression.[9]  (Id. at 67-68, 74).

In a Function Report dated January 9, 2011, and in her hearing testimony, Plaintiff reported that she lives alone in her own home and that her daily routine consists of showering,

---

[4] Plaintiff testified that her sleep medication makes her "tired and woozy" the next day.  (Tr. 59-60).

[5] Plaintiff testified that she was diagnosed with scoliosis by an orthopedist.  (Tr. 63).

[6] Plaintiff testified that she had surgery twice on the index finger of her left hand to remove a cyst (in October 2010 and May 2011) and was scheduled to have surgery to treat nerve damage to the finger but could not afford it.  (Id. at 61).  She now has numbness in her index finger.  (Id.).

[7] Plaintiff testified that she uses a nebulizer to treat shortness of breath, and she uses a CPAP machine at night because she stops breathing in her sleep.  (Tr. 64-65).

[8] Plaintiff testified that her depression makes her want to be alone and not get out of bed about three days a week.  (Tr. 62, 69).

[9] Plaintiff testified that she has transportation issues, but she acknowledged that she lives in Marion Junction, Alabama, which is about fifteen to twenty minutes from Selma and that there are psychiatrists/psychologists in Marion and in Selma.  (Tr. 68, 75).  She also acknowledged that she has a vehicle and drives frequently to the store and to church.  (Id.).  In addition, her primary care doctor, Dr. Park Chittom, M.D., is in Selma, Alabama.  (Id. at 355).

getting dressed, cooking, washing dishes, exercising "according to how [she] feel[s]," watching television, reading, and going back to bed at night.  (Id. at 252).  She also drives and visits her mother, sister, and brother who live nearby.  (Id. at 62, 68, 75).  She shops and goes to church.  (Id. at 62, 255-56). She cooks and cleans a little, does laundry, and irons.  (Id. at 70, 254).  She takes care of her own personal care needs, although she sometimes cannot lift her arms above her head (Id. at 253).  Plaintiff can stand for about thirty minutes and walk about two miles (Id. at 257) and can handle all of her own finances and banking (Id. at 255). Her social activities include going to church, and she does not need anyone to accompany her (Id. at 256). She has no problems getting along with family, friends, neighbors  nor authority figures, and has never been fired due to problems getting along with others(Id. at 257-258). Plaintiff reported problems finishing what she starts and paying attention, but indicated that she can follow written and spoken instructions "good" (id. at 257); and is able to handle stress and changes in routine "good" (Id. at 258).

**IV.  <u>Analysis</u>**

    **A.  <u>Standard of Review</u>**

      In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is

supported by substantial evidence and 2) whether the correct legal standards were applied.[10] <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B. Discussion**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to

---

[10] This Court's review of the Commissioner's application of legal principles is plenary. <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[11] 20 C.F.R. §§ 404.1520, 416.920.

---

[11] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since December 4, 2010, the alleged onset date, and that she has the severe impairments of hypertension with headache, obesity, recurrent inclusion cyst on the left index finger with history of infection, hyperlordotic curve of the lumbar spine, degenerative joint disease, and tobacco dependence.[12]   (Tr. 31).   The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments[13] contained in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Id. at 31-32).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a range of light work, with the following restrictions: Plaintiff "cannot climb ladders, ropes or scaffolds.   She can only occasionally crawl.   She cannot reach overhead with the left non-dominant upper extremity and can only occasionally finger with it.   She must avoid concentrated exposure to extreme temperatures, hazardous moving machinery, unprotected heights and pulmonary

---

[12] The ALJ found Plaintiff's situational anxiety and chronic neurotic depression to be non-severe.   (Tr. 31).

[13] The ALJ found that Plaintiff has only a "mild" degree of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation.   (Tr. 31).

irritants of fumes, odors, dust, gases, and poor ventilation." (Id. at 32). The ALJ also determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not entirely credible for the reasons explained in the decision. (Id. at 37).

The ALJ found that Plaintiff is unable to perform her past relevant work. (Id. at 40). However, utilizing the testimony of a VE, the ALJ concluded that Plaintiff is able to perform jobs such as "cashier," "self-service attendant," and "storage facility rental clerk" all of which are classified as light and unskilled. (Id. at 41). Thus, the ALJ concluded that Plaintiff is not disabled. (Id. at 42).

The Court now considers the foregoing in light of the record in this case and the issues on appeal.

### 1. **Issues**

### A. Whether the ALJ erred in finding Plaintiff's depression to be non-severe?

In this case, Plaintiff argues that the ALJ erred in finding that her depression is non-severe. (Doc. 14 at 1). Specifically, Plaintiff argues that the ALJ erred in failing to comply with the mode of analysis dictated by the Psychiatric Review Technique Form ("PRTF") for evaluating mental

impairments.   (Id. at 3).   The Commissioner counters that the ALJ expressly considered the four PRTF criteria when evaluating Plaintiff's depression and, further, that the ALJ's finding that Plaintiff's depression is non-severe is supported by substantial evidence.   (Doc. 19 at 1-4).   Having carefully reviewed the record in this case, the Court finds that Plaintiff's claim is without merit.

At her hearing, Plaintiff testified that her depression causes her to not want "to be bothered" and to not want to get out of bed.   (Tr. 62).   The ALJ determined at step two of the sequential evaluation process that, while Plaintiff has been diagnosed with "chronic neurotic depression," it is not severe. (Id. at 31).

"In order to evaluate the severity of a mental impairment, the Commissioner's regulations require the application of a 'special technique' or so-called 'paragraph B' criteria." Willis v. Commissioner of Soc. Sec., 2016 U.S. Dist. LEXIS 91497, *10, 2016 WL 3752182, *3 (M.D. Fla. July 14, 2016) (citing 20 C.F.R. § 404.1520a)).   "Under the special technique, the ALJ will rate the degree of functional limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."   Id. (citing 20 C.F.R. § 404.1520a(c)(3)). The degree of limitation in the first three areas are rated on a

five-point scale of none, mild, moderate, marked, and extreme, and the fourth area is rated as none, one or two, three, four or more. See id. (citing 20 C.F.R § 404.1520a(c)(4)). If the degree of limitation in the first three functional areas is none or mild, and the fourth area is none, the ALJ generally will conclude, as he did here, that the impairment is not severe, unless the evidence otherwise indicates more than a minimal limitation in ability to do basic work activities. See id. (citing 20 C.F.R. § 404.1520a(d)(1)). The ALJ's decision must incorporate findings and conclusions based on the special technique. See id. (citing 20 C.F.R. § 404.1520a(e)(4)).

As the Commissioner argues, the record shows that, in making his finding that Plaintiff's depression is not severe, the ALJ followed the special technique for assessing the severity of a mental impairment set forth in 20 CFR §§ 404.1520a, 416.920a and considered the four broad functional areas of the paragraph B criteria (i.e., Plaintiff's activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). (Tr. 31). The ALJ examined both the medical evidence and the opinion evidence and specifically discussed the Psychiatric Review Technique Form completed by State Agency reviewing psychiatrist, Dr. Robert Estock, M.D., on January 19, 2011. In the form, Dr. Estock opined that Plaintiff has no more than "mild" restrictions in

activities of daily living, maintaining social functioning, and
maintaining concentration, persistence, or pace, and no episodes
of decompensation.  (Id. at 31, 385).  The ALJ found that Dr.
Estock's opinion was consistent with the evidence that Plaintiff
has not sought professional mental health care for her
depression; her treatment records describe very conservative,
minimal mental health treatment from her primary care
physicians; she currently takes no antidepressant or anxiety
medication; she lives independently, taking care of all of her
own household and personal needs; and she drives.  (Id.).  The
ALJ stated that Dr. Estock's written explanation in his report
was "essentially the same as" his own, and, thus, he adopted Dr.
Estock's assessment of the "B criteria."  (Id.).  Accordingly,
Plaintiff's argument that the ALJ failed to evaluate the
severity of her depression using the "special technique" is
simply incorrect.

The Court likewise rejects Plaintiff's argument that the
ALJ's finding that her depression is not severe is not supported
by substantial evidence.  At the outset, the Court notes that,
even if Plaintiff's depression were severe, the ALJ's failure to
classify it as a severe impairment at step two of the sequential
evaluation process is not fatal.  See Bennett v. Astrue, 2013
U.S. Dist. LEXIS 115951, *14, 2013 WL 4433764, *5 (N.D. Ala.
2013) ("'[n]othing requires that the ALJ must identify, at step

two, all of the impairments that should be considered severe'
and, even if the ALJ erred by not recognizing every severe
impairment, the error was harmless since he found at least one
such impairment."); Ferguson v. Astrue, 2012 U.S. Dist. LEXIS
139135, *25, 2012 WL 4738857, *9 (N.D. Ala. 2012) ("[B]ecause
step two only acts as a filter to prevent non-severe impairments
from disability consideration, the ALJ's finding of other severe
impairments allowed him to continue to subsequent steps of the
determination process and his failure to list headaches as
severe does not constitute reversible error because, under the
Social Security regulations, the ALJ at later steps considers
the combined effect of *all* the claimant's impairments.")
(emphasis in original).

Here, the ALJ found Plaintiff's hypertension with headache,
obesity, recurrent inclusion cyst on the left index finger with
history of infection, hyperlordotic curve of the lumbar spine,
degenerative joint disease, and tobacco dependence to be severe
at step two and then proceeded on to the next steps where he
considered all of Plaintiff's impairments in combination,
including her depression. (Tr. 31-40). Thus, the ALJ satisfied
the requirements of the regulations.

Further, in order for an impairment to be severe, it must
be more than a slight abnormality or a combination of slight
abnormalities "that causes no more than minimal functional

limitations." 20 C.F.R. § 416.924(c). Indeed, it must "significantly limit[]" an individual's "ability to do basic work activities." 20 C.F.R. § 416.920(c). "It is [the] Plaintiff's burden to prove the existence of a severe impairment, and she must do that by showing an impact on her ability to work." Marra v. Colvin, 2013 U.S. Dist. LEXIS 105669, *13-14, 2013 WL 3901655, *5 (M.D. Fla. 2013) (citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)); see also Barnhart v. Thomas, 540 U.S. 20, 24 (2003) ("At step two, the SSA will find nondisability unless the claimant shows that he has a 'severe impairment,' defined as 'any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities.'") (quoting §§ 404.1520(c), 416.920(c)); McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Unless the claimant can prove, as early as step two, that she is suffering from a severe impairment, she will be denied disability benefits.").

Plaintiff has failed to satisfy her burden of proof with respect to the alleged severity of her depression. Although Plaintiff's medical records document her diagnosis of "chronic neurotic depression" (id. at 359), none of her medical records indicates that her depression is severe and significantly limits her ability to do basic work activities. Rather, Plaintiff's treatment records show only very conservative, minimal treatment

for depression by her primary care physicians, with no evidence of inpatient mental health treatment, emergency room visits for mental health issues, or treatment by a mental health professional of any kind.

Specifically, Plaintiff's treatment records show that on February 16, 2010, Plaintiff presented to her primary care physician, Dr. Park Chittom, M.D., at the Selma Doctors Clinic for "a total evaluation," and Dr. Chittom conducted a physical examination, which was completely normal, and a mental status examination, which was completely normal.  (Id. at 402).  Dr. Chittom diagnosed Plaintiff with hypertension and tension headaches and prescribed blood pressure medication and Trazodone (a sedative/antidepressant) "to help her rest."  (Id.).

Plaintiff did not return to Dr. Chittom for eight months. On October 4, 2010, Plaintiff presented with complaints of "inability to sleep," stating that she had "alot going on in her life."  (Id. at 359).  Dr. Chittom conducted a physical examination and a mental status examination, both of which were completely normal.  (Id.).  Dr. Chittom diagnosed Plaintiff with hypertension and "chronic neurotic depression with insomnia" and continued her previous medications.  (Id.).

Plaintiff returned for a follow up examination on December 16, 2010, and Dr. Chittom noted that she was taking her medications, that she was "doing well," and that she was

sleeping "real[ly] well."   (Id. at 356).   Plaintiff's physical and mental status examinations again were completely normal. (Id.).   Dr. Chittom continued her medications.   (Id.).

The final treatment note from Dr. Chittom is dated January 7, 2011, and titled "disability form."   (Id. at 396).   Dr. Chittom's notes reflect that Plaintiff's physical examination was completely normal on that date.   (Id.).   In addition, Dr. Chittom stated that he first saw Plaintiff in February 2010 for uncontrolled blood pressure and headaches, which were "exacerbated by her depression and anxiety," and that he had last seen her in December 2010 when he placed her on a "mild" antidepressant and blood pressure medication, resulting in an improvement in blood pressure, headaches, and insomnia.[14]   (Id.). Dr. Chittom noted Plaintiff's previous diagnoses of hypertension, tension headaches, and chronic neurotic depression, and he continued her regular medications.   (Id.). He assigned no functional limitations from any of her conditions.   (Id.).

The record shows that Plaintiff also received treatment on two occasions between 2009 and 2011 from the Rural Health Medical Program ("RHMP").   (Id. at 423-28).   On March 8, 2011,

---

[14] The record shows that Plaintiff was also treated from 2010 to 2012 by Dr. Robert Anderson, M.D., at Selma Doctors Clinic for a recurrent cyst on her left index finger.  (Tr. 395-96, 403, 434-35).

Plaintiff requested a check up, reporting a history of high blood pressure and complaining of lower back pain and abdomen pain. (Id. at 425). Plaintiff's physical examination showed mild right lower quadrant tenderness, and she was given a prescription for Mobic. (Id.). Plaintiff returned three months later, on June 28, 2011, with complaints of headaches, dizziness, swelling in legs, and left shoulder pain. (Id. at 426). She was diagnosed with hypertension, degenerative joint disease, and "situational anxiety" and prescribed blood pressure medication, anti-anxiety medication, and a diuretic. (Id. at 425-26).

Plaintiff was also treated on four occasions by Dr. Perry Timberlake, M.D., at the Hale County Hospital Clinic ("HCHC") from approximately October 30, 2012, to January 29, 2013. (Id. at 466-77). On October 30, 2012, Plaintiff presented to Dr. Timberlake with complaints of back pain, shoulder pain, headache, high blood pressure, and depression, and a history of surgery on her left index finger. (Id. at 466). Dr. Timberlake noted that he spent fifteen minutes with Plaintiff, during which time he conducted a physical examination, finding only a tender lumbosacral spine and paresthesias (tingling) in the legs. (Id. at 467). Based on his brief examination, Dr. Timberlake opined that Plaintiff was "completely and totally disabled to do gainful work now or in the future." (Id.). Dr. Timberlake

prescribed Lortab, blood pressure medication, an anti-inflammatory, and an antidepressant and instructed Plaintiff to follow up. (Id.). Plaintiff returned two weeks later, on November 13, 2012, for a pap smear and vaginal examination, which was normal. (Id. at 469-70). Two months later, on January 22, 2013, Plaintiff returned with complaints of an infected thumb. (Id. at 474). Her physical examination was completely normal, except for a tender thumb. (Id. at 475). Dr. Timberlake gave her a steroid injection and an antibiotic and instructed her to follow up in one week. (Id.). Plaintiff returned on January 29, 2013, with complaints of constipation and heart racing and was prescribed medication for high blood pressure, constipation, and infection. (Id. at 476-77). Her physical examination on that date again was normal. (Id. at 476). This is the final treatment note in the record.[15]

Also, as previously discussed, the record contains the PRTF

---

[15] The ALJ gave no weight to Dr. Timberlake's opinion that Plaintiff is completely and totally disabled to do work now or in the future. (Tr. 40). Given the inconsistency of Dr. Timberlake's opinion with his own treatment notes and with the substantial evidence in the case, the ALJ had good cause to discredit his opinion. See Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (good cause exists to discredit the testimony of any medical source when it is contrary to or unsupported by the evidence of record); Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (accord); Adamo v. Commissioner of Soc. Sec., 365 Fed. Appx. 209, 212 (11th Cir. 2010) (accord). Plaintiff does not take issue with the ALJ's finding in this regard.

completed by State Agency psychiatrist, Dr. Estock, who reviewed Plaintiff's records on January 19, 2011, and opined that Plaintiff has no more than "mild" restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id. at 385). As the ALJ found, Dr. Estock's opinion is consistent with the evidence of Plaintiff's activities of daily living, which includes that she lives alone in her own home, takes care of her own personal needs, cooks, cleans, does laundry, exercises "according to how [she] feel[s]," walks two miles, drives, visits relatives, goes to church, handles all of her own finances and banking, has no problems getting along with family, friends, or neighbors; gets along "good" with authority figures; has never been fired from a job because of problems getting along with people; can follow written and spoken instructions well; and can handle stress and changes in routine well. (Id. at 62, 68, 70, 75, 252-58).

In light of the evidence detailed above, the Court finds that the ALJ did not err in determining that Plaintiff's depression does not significantly limit her ability to do basic work activities, and thus, is not a severe impairment. The Court further finds that the substantial evidence detailed above supports the ALJ's RFC assessment for a range of light work with

the stated exertional restrictions.[16]   Accordingly, Plaintiff's claim fails.

### B. Whether the ALJ failed to conduct a full and fair hearing?

Plaintiff also argues that the ALJ erred in failing to conduct a full and fair hearing by issuing an unfavorable decision in this case without allowing her the opportunity to cross-examine Dr. Huey Kidd, D.O., about his post-hearing consultative report. (Doc. 14 at 3-4). Plaintiff argues that, while the ALJ allowed her to submit interrogatories to Dr. Kidd after receiving the report, Dr. Kidd never responded to the interrogatories, and the ALJ issued his decision denying benefits without giving Plaintiff the opportunity to subpoena him to appear for cross-examination at a supplemental hearing. (Id.).   The Commissioner counters that the ALJ fully considered the interrogatories and found them to be adequately answered by the report itself. (Doc. 19 at 5).   Having carefully reviewed the record in this case, the Court finds that Plaintiff's claim is without merit.

---

[16] As discussed, the ALJ determined that Plaintiff can perform a range of light work, with the following exertional restrictions: Plaintiff "cannot climb ladders, ropes or scaffolds.   She can only occasionally crawl.   She cannot reach overhead with the left non-dominant upper extremity and can only occasionally finger with it.   She must avoid concentrated exposure to extreme temperatures, hazardous moving machinery, unprotected heights and pulmonary irritants of fumes, odors, dust, gases, and poor ventilation." (Tr. 32).

The record shows that the ALJ informed Plaintiff and her attorney at the administrative hearing on May 7, 2012, that, before he made his final decision, he would order a post-hearing consultative examination; he would request a pulmonary function test to help explain Plaintiff's complaints of shortness of breath and fatigue; and he would order a physical examination with a lumbar x-ray. (Tr. 74-76). On August 8, 2012, Dr. Huey Kidd, D.O., examined Plaintiff at the request of the Agency. (Id. at 453). At the examination, Plaintiff reported a history of scoliosis, lower back pain, hypertension, COPD, carpal tunnel syndrome, and two previous surgeries on her non-dominant index finger to remove a recurring cyst. (Id.). Plaintiff reported that her only medication was Atenolol, which she was taking for high blood pressure. (Id. at 454).

Plaintiff's physical examination revealed that she was obese, that her heart function and lung function were normal, that her abdomen was non-tender, that her extremities were normal with no swelling, that her grip strength was 5/5 bilaterally, that she was able to heel/toe walk, squat, stand, and touch her toes without difficulty, that her straight leg raise was negative, and that she ambulated without difficulty. (Id.). Dr. Kidd noted that Plaintiff's deep tendon reflexes were over four bilaterally, indicating hyperactive reflexes. (Id.). X-rays of Plaintiff's lumbar spine and chest revealed a

hyperlordotic curve of the lumbar spine and a "very slight" scoliotic curve on the left side (described by Dr. Kidd as "essentially straight"). Otherwise, the x-rays were normal. (Id.). Dr. Kidd also conducted pulmonary function tests resulting in some below normal findings, but none of which Dr. Kidd found to be disabling. (Id. at 456).

Dr. Kidd opined that Plaintiff had back pain and "scoliosis by history" and that her x-rays revealed a hyperlordotic curve in her lumbar spine. (Id. at 454). However, Dr. Kidd opined that there was no support for her back pain in his examination or in the x-rays. (Id.).

Dr. Kidd completed a MSS and opined that Plaintiff can lift/carry 50 pounds frequently, can sit, stand, and walk for eight hours each in an eight-hour work day (id. at 458-59), is unlimited in the use of her hands (including fingering and feeling) and unlimited in the use of her feet (id. at 460), can frequently balance, stoop, kneel, crouch, and crawl, can occasionally climbs stairs and ramps, can never climb ladders and scaffolds, and can never work around unprotected heights. (Id. at 461-62). Dr. Kidd opined that Plaintiff had no limitations in performing activities such as sorting, handling, using paper files, shopping, traveling alone, ambulating without assistance, walking a block on uneven surfaces, using standard transportation, climbing steps with a hand rail, preparing

simple meals, and caring for her own personal needs. (Id. at 463). In sum, Dr. Kidd assigned no significant functional limitations.

As Plaintiff has asserted, upon receipt of Dr. Kidd's report, her attorney submitted four interrogatories, which the Agency submitted to Dr. Kidd on three separate occasions, but to which Dr. Kidd never responded. (Id. at 291, 309-10). Those interrogatories were: (1) Please list the records you reviewed in this claim; (2) Please state specifically the basis you contend [Plaintiff] has no restriction on her ability to finger and feel; (3) When completing the Medical Source Statement on behalf of [Plaintiff], what ailments did you take into account; and (4) Would you expect [Plaintiff] to miss 3 days of work per month? Please explain your answer. (Id. at 495). After receiving no response from Dr. Kidd, the ALJ issued his decision denying benefits, stating:

> Having been made aware of the examiner's nonresponse to the representative's questions, the undersigned carefully considered the four written questions being posed by counsel. The undersigned finds that the four questions are not necessary to inquire fully into the matters at issue. It is readily apparent that the examiner physician based his conclusion on objective evidence that he documented in the report (e.g., physical examination objective findings, pulmonary function testing, and x-rays). His report clearly includes a discussion of the ailments he considered, and he notes records he relied on, such as

> the x-ray reports.  In relation to counsel's
> question number four, none of the findings
> in the report even remotely suggest that
> this examiner would opine that that the
> claimant would miss three days of work per
> month.  In fact, his medical source
> statement indicates little diminished
> functional capacity in that he opines the
> claimant can perform a range of *heavy* work.
> In sum, the undersigned finds that the four
> questions from the representative to the
> examiner through interrogatories is not
> required to inquire fully into the matters
> at issue, and the record has been adequately
> developed.  Thus, the undersigned proceeds
> with a decision.

(Id. at 28-29) (emphasis in original).  Having reviewed the

record at length, the Court finds that Plaintiff's claim that

the ALJ violated her due process rights by failing to allow her

the opportunity to cross-examine Dr. Kidd after he failed to

answer the proffered interrogatories is without merit.

Due process requires the "opportunity to be heard at a

meaningful time and in a meaningful manner" and entitles a

claimant "to a full and fair hearing."  Martz v. Commissioner,

Soc. Sec. Admin., 2016 U.S. App. LEXIS 9123, *37-38, 2016 WL

2909201, *13 (11th Cir. May 19, 2016) (citations and internal

quotation marks omitted).  The Supreme Court has determined that

procedural due process is applicable to the Social Security

adjudicative administrative process and entitles a party, *inter*

*alia*, "to conduct such cross-examination as may be required for

a full and true disclosure of the facts."  Richardson v.

_Perales_, 402 U.S. 389, 401, 409 (1971).  In that regard, the Supreme Court has held that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  _Mathews v. Eldridge_, 424 U.S. 319, 334 (1976).

"The determination of whether cross-examination [of a post-hearing consultative physician] is warranted appears to be within the discretion of the ALJ."  _Martz_, 2016 U.S. App. LEXIS 9123 at *38, 2016 WL 2909201 at *13 (citing _Demenech v. Secretary of the Dep't of Health & Human Servs._, 913 F.2d 882, 884 (11th Cir. 1990) (assuming, without deciding, that that the ALJ has the discretion to determine whether cross-examination is warranted)).  In _Demenech_, the Eleventh Circuit held that, where the ALJ (1) _substantially relies_ upon a post-hearing medical report" that (2) _"directly contradicts_ the medical evidence that supports the claimant's contentions," "cross-examination is of extraordinary utility."  _Id._, 913 F.2d at 885 (emphasis added).  The _Demenech_ court concluded that Plaintiff's due process rights were violated where a claimant was not allowed to cross-examine a post-hearing physician who wrote a report which was the "most prominent," "crucial" piece of supporting medical evidence and "primary basis" for the ALJ's decision that the claimant's condition had improved to the point that he could return to work, a position which directly contradicted all of the other medical evidence in the case,

including the evidence from Plaintiff's treating physician.

Applying Demenech to the facts of this case, the Court finds that the ALJ was not required to allow Plaintiff to cross-examine Dr. Kidd about his post-hearing consultative report in order to comport with due process. In this case, the ALJ did not substantially rely on Dr. Kidd's medical report. To the contrary, Dr. Kidd's report was not the "primary basis" for the ALJ's decision. In fact, the ALJ only gave it only "some" weight, stating that it was not entitled to controlling weight given the lack of a treating relationship. (Tr. 40).

Moreover, Dr. Kidd's report did not directly contradict the medical evidence supporting the Plaintiff's contentions.[17]   To the contrary, Dr. Kidd's report is consistent with the treatment notes of Plaintiff's primary care physician, Dr. Chittom, which reflect that Plaintiff was treated from approximately February 2010 to January 2011 for high blood pressure, headaches, depression, and anxiety and that, with medication therapy, her conditions improved, and she was "doing well."   (Id. at 356, 359, 374, 396, 402).   Dr. Chittom's notes further reflect

---

[17] While Dr. Kidd's findings and opinions do contradict those of one of Plaintiff's treating physicians, Dr. Timberlake, the Court has already determined that Dr. Timberlake's opinions were inconsistent with his own medical findings, as well as the substantial medical evidence in the case and, thus, were properly discredited by the ALJ. As previously noted, Plaintiff does not take issue with the ALJ's rejection of Dr. Timberlake's opinions.

largely normal physical and mental examinations, which is also consistent with Dr. Kidd's report.[18] (Id.).

Dr. Kidd's report is also consistent with Plaintiff's treatment notes from the Rural Health Medical Program from 2009 to 2011 which show conservative medication treatment for high blood pressure, headaches, dizziness, low back pain, swelling in legs, shoulder pain, and abdomen pain and largely normal physical examinations. (Id. at 423-28).

Dr. Kidd's report is also consistent with Plaintiff's activities of daily living, which include living independently, taking care of all of her own household needs (cleaning, cooking, laundry), taking care of her own personal needs, driving, shopping, going to church, and walking up to two miles at a time. (Id. at 62, 68, 75, 252, 255-57).

Moreover, although Dr. Kidd ignored multiple requests by the Agency to respond to Plaintiff's submitted interrogatories, the interrogatories were largely answered by the report itself, as the ALJ found. (Id. at 28). Dr. Kidd's report shows that he

---

[18] Dr. Chittom's notes also reflect that, after Plaintiff's second surgery to remove a recurring cyst from her non-dominant left index finger, her wound was "well healed," and she was "going to start using it and getting range of motion back in it." (Tr. 420). In June, 2012, x-rays of Plaintiff's left index finger, taken when she presented to the emergency room for an infected finger, indicated cellulitis, but there was "no cortical destruction to suggest osteomyelitis." (Id. at 450). Plaintiff was prescribed an anti-inflammatory and an antibiotic and released. (Id. at 444).

reached his conclusions based on his own tests and examination findings; he specifically found that Plaintiff had no swelling in her extremities and had grip strength of 5/5 bilaterally, which undoubtedly led to his opinion that Plaintiff had no restriction in her ability to finger and feel; he discussed the ailments that he considered, those being, scoliosis, back pain, hypertension, COPD, carpal tunnel syndrome, and recurring cyst on left index finger; and it is readily apparent from his report that he would not have expected Plaintiff to miss three days of work per month because of her impairments, as he found that she had essentially no functional limitations whatsoever. (Id. at 453-63, 495).

Therefore, based on the foregoing evidence, the ALJ did not violate Plaintiff's due process rights by denying her the opportunity to cross-examine Dr. Kidd about his post-hearing consultative report. See James v. Barnhart, 177 F. Appx. 875, 877 (11th Cir. 2006) ("Because the ALJ did not substantially rely on [the] post-hearing report to deny [plaintiff] benefits, and the report was consistent with the reports of three other consultative physicians, and contradicted only the conclusory and unsupported findings of two of [plaintiff's] treating physicians, we can find no due process violation in the ALJ's denial of [plaintiff's] supplemental-hearing request.") (emphasis in original).

28

Accordingly, Plaintiff's claim must fail.

**V.     Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **28th** day of **September, 2016.**

```
                        /s/ SONJA F. BIVINS
                UNITED STATES MAGISTRATE JUDGE
```